J. C. KINCAID, appellant, v. A. J. ESTES, Respondent.[*]

Kansas City Court of Appeals. May 26, 1924.

1. **BILLS AND NOTES: Fraud: Where Note Acquired by Payee Through Fraud Was Shown, Transferee Had Burden of Showing Good Faith and Lack of Knowledge of Fraud.** Where fraud in acquiring note by payee was shown the plaintiff transferee had burden of showing his good faith and lack of knowledge of the fraud.

2. ———: **Consideration: Where Defense to Note Was Lack of Consideration Defendant Has Burden of Showing Transferee Had Knowledge Thereof.** In a suit by transferee upon a note where defense was lack of consideration, defendant must show not only such a lack but that plaintiff had knowledge of such fact.

3. **TRIAL PRACTICE: Estoppel: Plaintiff Estopped to Assign Error in Refusal of Peremptory Instruction Where After Refusal He Requested Instructions Submitting the Issues to Jury Thereby Assuming Inconsistent Position.** Where plaintiff was estopped from claiming that there was no evidence of certain facts, there was no error

in refusing his peremptory instruction when after refusal thereof he requested instructions submitting such facts to the jury, thereby assuming an inconsistent position.

4. ——: Instruction: Where Evidence Was Undisputed as to Plaintiff Being Absolute and Unconditional Owner of Note it was Error to Give Instruction Submitting Such Issue. Where plaintiff proved indorsement to him of note sued on and that he was owner thereof, and such evidence being undisputed, it was error to give an instruction submitting question that plaintiff must have been absolute and unconditional owner thereof at time of institution of suit before he could recover.

5. ——: Indorsee Taking Note as Collateral Security for Debt Then Created and on Faith Thereof Held Holder for Value in Due Course. Where a note is taken by indorsee as collateral security for a debt created at the time note was given and on faith thereof indorsee *held* a purchaser for value in due course.

6. ——: Payment of Full Value of Note not Necessary to Make Indorsee Holder Thereof for Value. Payment of the full value of a note is not necessary to make a holder for value, although the consideration paid must be more than merely nominal.

7. ——: Title to Note Passed at Time of Sale Notwithstanding Option Was Given to Seller to Repurchase Same at Later Date. Title to note passed at time of its sale, and payment therefor by plaintiff giving deed to land, even though seller was given an option to repurchase note at later date.

8. **INSTRUCTIONS:** Invited Error: Party Cannot Complain of Error in Instructions Joined in by Him. Where defendant's instructions failed to tell jury what constituted bad faith or want of honesty, plaintiff could not complain thereof because he joined in the error by using the same terms without definition in his instructions.

---

*Headnotes 1. Bills and Notes, 8 C. J., Section 1292; 2. Bills and Notes, 8 C. J., Sections 1294, 1295; 3. Appeal and Error, 4 C. J., Section 2625; 4 Bills and Notes, 8 C. J., Section 1363; 5. Bills and Notes, 8 C. J., Section 702; 6. Bills and Notes, 8 C. J., Section 701; 7. Bills and Notes, 8 C. J., Section 570; 8. Appeal and Error, 4 C. J., Section 2620.

Appeal from the Circuit Court of Boone County.—
*Hon. D. H. Harris,* Judge.

REVERSED AND REMANDED.

*Meriwether & Meriwether, McBaine & Clark* and *Paul M. Peterson* for appellant.

*North T. Gentry* for respondent.

BLAND, J.—This is a suit upon a promissory note in the sum of $2000 executed by the defendant as maker on November 1, 1921, falling due twelve months after date, with interest at six per cent, and payable to H. L. Yager or order. There was a verdict and judgment for defendant and plaintiff has appealed.

The petition alleges that plaintiff acquired the note by endorsement "on the —— day of December, 1921." The answer consists of a general denial and pleads fraud in the execution of the note and a lack of consideration therefor, all of which plaintiff was aware when he purchased the note, and denies that the note was endorsed or transferred to plaintiff for value or before maturity and denies that plaintiff is the owner of the note. The reply consists of a general denial and alleges that plaintiff acquired the note before maturity without any knowledge of the defenses pleaded in the answer.

It is admitted that the facts show that the note was procured by fraud and was without consideration as pleaded in the answer. Defendant testified, and his testimony was uncontradicted, that Yager, prior to the procurement of the note from defendant, had sold to the latter $1000 worth of stock in the Jiffy Rim Lock Company and that the stock proved to be worthless; that on November 1, 1921, Yager came to defendant's office in Columbia and admitted to the latter that the stock was worthless and that he wanted to repay to defendant the $1000 that defendant had invested in it; that Yager told defendant that he would sell him $2000 worth of stock in the United States Mining Corporation which defendant knew something about as he had previously purchased some of it, and that while the par value of the stock was $2000 it was actually worth $3000 because the board of directors had recently made a raise in the price

of the stock from $1 to $1.50 a share. Yager told defendant that if he would take this mining stock and give him his note for $2000 that he would give defendant credit for the $1000 on the purchase price of the stock. Yager told defendant that he owned the stock but that he did not have it with him but would assign and mail it to defendant in a short time. Relying upon these representations defendant signed and delivered the note in suit to Yager. Yager never delivered the stock although defendant made repeated demands of him for it and the statement of Yager to defendant that the price of the stock had been raised from $1 per share to $1.50 proved to be untrue. Defendant had known Yager for four or five years before he gave him the note in suit and during that time had had a number of business transactions with him.

Plaintiff testified that the circumstances under which he purchased the note were as follows: That he and Yager had for sometime lived in Monroe County, Missouri; that prior to the buying of this note he had one business transaction with Yager which took place about six years before the trial when Yager purchased from plaintiff a Ford sedan; that Yager was engaged in representing a company in selling stock food and that plaintiff had heard that he handled some oil stock; that in November, 1921, Yager called on plaintiff, who was engaged in the real estate business in Monroe City in a small way and at times made a few loans, and borrowed of him $10 in cash; that at this time nothing was said about security; that about one week thereafter and on November 28, 1921, Yager returned and asked plaintiff for a loan of $100 and offered the note sued on as security and showed plaintiff a letter from a bank in Columbia, where defendant resided, addressed to a bank in Monroe City relative to the financial responsibility of defendant. Plaintiff lent Yager at this time $100 and the latter endorsed the note in blank and left it with plaintiff as security for the money he owed him. On December 3, 1921, plaintiff lent Yager another $100 and on Decem-

ber 13 he lent him $155.  On December 20th or 21st Yager, desiring to go to Colorado, wanted another loan and at that time plaintiff borrowed from the bank the sum of $300 on their joint note which plaintiff agreed to pay and did pay.  In addition to these loans plaintiff gave Yager his note for $100 and afterwards sent Yager a check to take it up.  When the $300 transaction was had the parties went to an attorney who drew up a note in favor of plaintiff in the sum of $915, due ninety days after date and signed by Yager, reciting that Yager had deposited with plaintiff as collateral security therefor the note in suit. This $915 note was introduced in evidence together with the three checks in the sum of $100 each and one check in the sum of $155.  These checks bear the endorsement of Yager except the first one for $100, which plaintiff testified he cashed and gave the money to Yager.

Just prior to going to Colorado, Yager was in plaintiff's office in Monroe City when plaintiff told Yager that he had $1000 invested in a Pike County, Missouri, farm, which he would like to get out of and authorized Yager to trade the farm for property in Colorado.  Plaintiff testified that he had lent his brother-in-law $1000 upon the Pike County farm and that his brother-in-law was unable to pay the loan; that the farm had depreciated in value and was not worth more than the amount of a deed of trust on it together with the $1000 that plaintiff had against it, so the brother-in-law turned the farm over to plaintiff.  Plaintiff testified that there was a written agreement covering the transaction wherein the brother-in-law turned the farm over to him but that it had been destroyed.

Yager went to Denver, Colorado, and negotiated a trade of the Pike County farm for 214 acres of land, subject to a mortgage of $2500, located in Elbert County, Colorado, and owned by one Williams.  Plaintiff then went to Denver with the abstract to the Missouri farm, the title to which proved to be defective, and deeds to the two properties were placed in escrow in a bank in

Denver until plaintiff could have the title to the Missouri farm corrected. An agreement was drawn between plaintiff and Williams, which was introduced in evidence, designated as an escrow agreement, for the trade of the farms; each farm was to be traded subject to a deed of trust in the sum of $2500. Plaintiff returned to Missouri and had the title to the Pike County farm perfected but before the trade was made Yager proposed that he would take the Colorado land off of plaintiff's hands, in other words, would purchase the equity in the Colorado land on the following terms: Yager would give plaintiff a second deed of trust upon the Colorado land for $1000 to cover plaintiff's interest in the Missouri land, which plaintiff desired to get out of, and in addition Yager would give plaintiff the note in suit, and that plaintiff should cancel Yager's indebtedness to him. This agreement, except the cancellation of the indebtedness, was evidenced in writing, dated March 18, 1922, and was introduced in evidence. This agreement further provided that Yager should have the right to the return of the note in suit with all interest thereon if he should pay plaintiff on or before November 1, 1922, the sum of $1700 in cash. The agreement was carried out and Yager executed a note and deed of trust in the sum of $1000 in favor of plaintiff's wife. The deed of trust securing this note was introduced in evidence. There also appears in evidence a warranty deed from Nettie C. Williams of Denver, Colorado, to Yager, conveying the Colorado land subject to a deed of trust in the sum of $2500; also a deed from Yager to Sebastian of Denver, Colorado, conveying the Colorado land subject to two deeds of trust, one for $2500 and the other in the sum of $1000, the latter being the deed of trust in favor of plaintiff's wife. The deed from Williams was made to Yager in order to save the expense and trouble of two transfers, that is, one from Williams to plaintiff and the other from plaintiff to Yager. Plaintiff testified that Yager never offered to repurchase the note in suit.

Plaintiff testified that he knew nothing of Yager's transactions with defendant prior to the time he obtained the note and made no inquiry of Yager as to how the note was procured by him. However, he testified that prior to the time the note was placed with him as collateral security he went to Columbia and talked to one Smith, an officer in a bank there, in regard to defendant's financial standing, and that he attempted to see defendant but learned that defendant was out of town and did not see him. Smith, the officer of the bank, testified that plaintiff was in his bank during the latter part of 1921 or the first of 1922, inquiring of defendant's financial standing and that he gave plaintiff "some information along that line." After the note became due plaintiff sent it to the Columbia bank for collection, but defendant refused to pay it. Plaintiff then went to Columbia to see defendant about paying it. This, plaintiff testified, was the first time that he learned that defendant was claiming that the note was procured by Yager without consideration and by false representations. He testified that defendant inquired of him concerning the transactions through which he procured the note; that defendant asked him to sign a statement in regard to the matter which he refused "because I didn't see any value in that statement at that time." Plaintiff testified that he had never before bought a note in the way he purchased the note in controversy; that he did not ascertain what, if any, taxes were due on the Colorado land and did not know what it was worth. The evidence shows that there were taxes in the sum of $104.64 upon the land at the time he purchased it.

Defendant, testifying in his own behalf, described the manner in which the note was procured from him. We have before stated this evidence. He further testified that after he refused to pay the note at the bank he received a letter from plaintiff whereupon he wrote plaintiff that there was $1000 due him on the note; that the stock in the mining company "must be presented;" that plaintiff then came to see him; that he told plaintiff that he had never received anything for the note and "that

the stock was due yet and that one thousand dollars was due to be credited on it.'' Plaintiff told him that ''he had brought the note a short time before that.'' This was told defendant about Christmas, 1922. Plaintiff first told defendant that he had taken the note as collateral for $300 and finally said that he had traded for some land and procured the note in the trade. Plaintiff said he ''had made a roundabout trade and did not know what it (the land) was worth;'' he finally said ''he guessed'' that the note cost him $1865. In March plaintiff came back and defendant wrote out an agreement for him to sign, stating that he had given $1865 for the note but plaintiff refused to sign it. Yager did not testify.

At the close of the evidence plaintiff offered an instruction. in the nature of a demurrer to the evidence, which was refused. The case was then submitted to the jury upon instructions offered by plaintiff and defendant. Plaintiff's instruction B told the jury that an endorsee of a negotiable paper is presumed to have taken it in due course before maturity and that in order to rebut this presumption the burden of proof was upon the defendant to show that the note was transferred after maturity or with want of honesty or bad faith on the part of plaintiff in acquiring it; that unless defendant showed these things, the verdict should be for plaintiff. Instruction C told the jury ''that a holder of a negotiable paper who takes it before maturity for a valuable consideration in the usual course of business without knowledge of the facts which impeaches its validity as between the original parties is deemed a bona-fide holder'' of it and that in order to defeat the instrument under such circumstances it was not sufficient to show that the paper was without consideration or was obtained by fraud; that it must appear that the purchaser actually knew of its invalidity or was guilty of dishonesty or bad faith in not knowing; that a purchaser before maturity is under no obligation to make inquiry as to the origin of the paper; and that if plaintiff acquired the ''note before maturity in the usual course of business in good faith

and for a valuable consideration, and without knowledge of any false and fraudulent representations on the part of H. L. Yager," plaintiff was entitled to recover although defendant "did not receive a consideration for said note, and was swindled and defrauded in the purchase of the mining stock for which the note was given."

Plaintiff now insists that the court erred in refusing to give his peremptory instruction in the nature of a demurrer to the evidence, for the reason that plaintiff offered evidence establishing the fact that he became the owner of the note for value and before maturity and that at the time he acquired the note he had no knowledge of any fraud practiced by Yager upon the defendant, or that it was given without consideration and that defendant having failed to offer evidence showing that plaintiff had knowledge of these transactions, it was the duty of the trial court to direct a verdict for plaintiff. The law in regard to the burden of proof in matters of this kind is stated in Bank of Hale v. Linneman, 235 S. W. 178, 181—

". . . this burden is on the holder to prove his good faith and lack of notice of fraud when fraud has been shown in the procuring of the note. If the holder shows this, then the burden is upon the defendant to prove specific facts tending to show plaintiff's actual knowledge of the defect in the title or his bad faith. In case of defendant's failing to offer any evidence to that effect, plaintiff is entitled to a direct verdict. [Downs v. Horton, 230 S. W. 103, and cases therein cited.] Mere suspicious facts, or facts that would put a reasonable man on inquiry, or negligence, is not sufficient to charge a purchaser of a note with notice of the fraud. Actual notice of the facts concerning the execution of the note must be brought home to the holder. Nothing short of actual knowledge or bad faith will defeat the holder's title. [Downs v. Horton, supra, loc. cit. 106, and cases cited.] However, such actual knowledge may be inferred from the facts and circumstances surrounding the purchase of the note by the holder, but such facts and

circumstances cannot be inferred from things that would merely put a prudent man on inquiry.''

The rule concerning the burden of showing a lack of consideration for the giving of a note is somewhat different from the rule in regard to showing notice of fraud. When fraud is shown the burden is upon the holder to prove his good faith and lack of knowledge of the fraud while it is not only the duty of the defendant when lack of consideration is claimed, to show such a lack but to show that plaintiff had knowledge of such fact. [Pattonsburg Savings Bank v. Koch, 255 S. W. 580, 583; Bank of Polk v. Wood, 189 Mo. App. 62.]

However, plaintiff is estopped from now claiming that there was no evidence tending to show that he had actual knowledge of the fraud and lack of consideration or that he purchased the note before maturity, for the reason that he submitted these issues to the jury in his instructions A and B. It is held in Everhart v. Bryson, 244 Mo. 507, that although a defendant by unsuccessfully asking a peremptory instruction does not waive his right to have the adverse action of the court reviewed on appeal by subsequently asking other instructions, such rule does not apply where the plaintiff pursues the same course; that under such circumstances when plaintiff offers other instructions he is assuming an inconsistent position in that by asking the peremptory instruction he assumes the position that under the undisputed tes timony he is entitled to recover but in asking other instructions submitting issues of fact to the jury after the peremptory instruction is overruled, his position is inconsistent in that he admits that there is a dispute in the testimony while his peremptory instruction assumes that there is no such dispute. In submitting the peremptory instruction plaintiff's theory is that he is entitled to recover as a matter of law, which he abandons when he asks instructions submitting to the jury his right to recover. The two positions are inconsistent. Plaintiff in his brief wholly fails to properly understand

the reason why it is held that the two situations are at variance.

However, plaintiff insists that the defendant had the burden of proving the defenses in the case and it became necessary for plaintiff to offer instructions to meet the defenses submitted in defendant's instructions, and as to these issues that defendant had the burden of proving defendant "pitched the battle field," and plaintiff ought not to be estopped by reason of the fact that he requested instructions, after his peremptory instruction was overruled, to meet the issues submitted in defendant's instructions. However, the case of Everhart v. Bryson, supra, is based upon something more than the fact that defendant in the ordinary law suit is merely called upon to meet the claims of his adversary, and that he ought not to be estopped from offering instructions to meet the claim of plaintiff when defendant's demurrer to the evidence has been overruled, but also upon the ground that defendant occupies a different attitude toward his adversary than plaintiff because plaintiff brings the action, and if the ruling on his demurrer is adverse, he can take a non-suit but the defendant cannot. Defendant is in court without his consent, the court may make any number of rulings that defendant deems erroneous but he cannot abandon the case, he is in court and must remain until the case is finished; he has a right to tender as many defenses as he has; if the court erroneously denies him one, he must avail himself as best he can of those remaining.

Aside from this, it will be borne in mind that the burden was upon plaintiff to show that he had no knowledge of the fraud. This was an affirmative matter. Plaintiff brought defendant into court and the latter had a right to defend the case the best he knew how. Plaintiff at any stage, when he found the rulings of the court going against him, could have dismissed his cause of action, but defendant could not have done so. We think that there is no question under the ruling of Everhart v. Bryson, supra, Bank v. Wangler, 254 S. W. 739;

Thomas v. Boatright, 245 S. W. 211; Creek v. Railroad Company, 293 Mo. 541; Horse & Mule Co. v. Hatfield, 175 Mo. App. 296, plaintiff is now estopped from urging that the court should have directed a verdict for him on account of the fact that, as he claims, there was no testimony showing that plaintiff had actual knowledge of the fraud in the procurement of, and lack of consideration for, the note, or that he purchased it after maturity.

We think, however, that the court erred in giving the following instruction for plaintiff—

"Unless the jury find from the evidence that the plaintiff was the absolute and unconditional owner of the note here sued on at the time of the institution of this suit, then the jury must find for the defendant."

There was no conflict in the testimony that plaintiff was the absolute and unconditional owner of the note at the time suit was filed. It is true that the burden of proving the endorsement of the note to and the ownership of the note in plaintiff was upon him. Plaintiff so proved and there is no dispute in the evidence concerning the matter.

"It is necessary, however, to distinguish between the necessity for plaintiff to prove the indorsement to show that he is the owner and entitled to sue, and the necessity for proving the indorsement to show that he occupies the position of a bona-fide holder in due course. Where the answer raises an issue as to plaintiff's ownership of the note sued on by sale and indorsement thereon by the payee to him, plaintiff has the burden of proving ownership but need not go further and prove that he is a holder in due course." [8 C. J. 1011.]

However, defendant argues that plaintiff first told defendant that he held the note as collateral for a loan of $300; that if the jury believed this and not the other testimony of plaintiff as to how he came to own the note, which testimony defendant views with suspicion especially when taken in connection with plaintiff's admissions to defendant and plaintiff's petition, plaintiff was not entitled to sue. This seems to give rise to another and dif-

ferent point. There is a rule in this State that a trans-
feree of a note held by him merely as collateral security
for a pre-existing debt is not a holder for value in the
usual course of business. [Wright v. Trust Co., 144 Mo.
App. 640, 648; Loewen v. Forsee, 137 Mo. 29, 41.] But
this testimony of defendant relied upon by him shows
that plaintiff told him that he held the note as collateral
security for a loan made at the time the note was given
him. "Where a note is taken as collateral security for
a debt at that time created and on the faith thereof,
.  .  .  the consideration is sufficient and the indorsee a
purchaser for value in due course of business." [8 C.
J. 487.] "It is well settled that the payment of the
full face value of a note is not necessary to make a holder
for value, although the consideration paid must be more
than merely nominal." [8 C. J. 486.] The evidence, as
we have stated, is undisputed that plaintiff was the in-
dorsee of the note and the owner thereof, and this issue
should not have been submtited to the jury. [Downs
v. Horton, 230 S. W. 103.]

It is insisted, however, that under the agreement
had between plaintiff and Yager on March 18, 1921, plain-
tiff did not become the owner of the note until Novem-
ber 1, 1922, in view of the fact that Yager was given, in
the agreement, until this latter date to repurchase the
note from plaintiff; that if plaintiff did not become the
owner until November 1, 1922, he acquired title to it after
the maturity of the note. We think there is no question
but that title to the note passed on March 18, 1922.
Plaintiff gave up his interest in the land at that time in
consideration of Yager's conveying to him the full title
and ownership of the note. The title then passed even
though Yager was given an option to repurchase the
note at a later date. He might or might not take ad-
vantage of this option.

Complaint is made of defendant's instructions Nos.
1 and 2 on the ground that they tell the jury that if they
believed from the evidence that plaintiff was guilty of

want of honesty or an act of bad faith in acquiring the note, plaintiff could not recover, and if plaintiff did not take the note in good faith and for value, he was not entitled to recover. It is claimed that the instructions failed to tell the jury what constituted bad faith or want of honesty. But if this was error, defendant joined in the error by using the same terms without definition in his instructions. [Smart v. Kansas City, 208 Mo. 162, 204; Hall v. Water Co., 48 Mo. App. 356, 363.] The case of City of Weston v. Chastain, 234 S. W. 350, cited by plaintiff, is clearly not in point.

The judgment is reversed and the cause remanded. All concur.