STATE OF MISSOURI upon the information of ROY McKITTRICK, Attorney General, at the relation of the CITY OF SPRINGFIELD, a Municipal Corporation, Relator, v. SPRINGFIELD CITY WATER COMPANY, a Corporation.—131 S. W. (2d) 525.

Court en Banc, September 5, 1939.*

---

*NOTE: Opinion filed at September Term, 1938, April 4, 1939; motion for rehearing filed; motion overruled at September Term, 1939, September 5, 1939.

*Roy McKittrick,* Attorney General, *James L. HornBostel, Kirby W. Patterson, Frank C. Mann* and *Fred A. Moon* for relator.

*W. D. Tatlow* and *Neale & Newman* for respondent.

10

HAYS, J.—This is an original proceeding in the nature of *quo warranto* instituted by information filed by the Attorney General

on December 19, 1936, whereby it is sought to oust the respondent from the use, in connection with its water system, of the streets and public thoroughfares of the City of Springfield.

To our order to show cause, thereupon issued, the respondent filed answer and plea in abatement, to which the informant filed a reply. In response to the new matter set up therein respondent filed a rejoinder, thus joining issue. This court thereafter appointed R. B. Oliver, Jr., a member of our Bar, as Special Commissioner to take evidence and report on all issues of law and fact. On August 5, 1938, the Special Commissioner filed his full report and on August 22 the relator filed exceptions thereto. In due course and at the present term the cause was heard on oral arguments and briefs of counsel on both sides and submitted. ' The evidence is voluminous, covering some five hundred pages of the printed record and ranging back through a period of more than a half-century. Hence, unavoidably, the report of our learned Special Commissioner is of a length proportionate to the record. We acknowledge our indebtedness to him for its thoroughness and helpfulness.

Relator claims that respondent is occupying the streets of Springfield without franchise and illegally. On the other hand, respondent contends: (1) that it has a legal franchise or street easement, granted to it (a) directly by the State with the consent of the municipality and (b) also granted to it by the city directly as the duly authorized agent of the State; and (2) that in any event the city, by its acts and conduct over many years, is estopped from asserting that such franchise does not exist.

Before considering the merits of the case we must pass upon a preliminary question raised in the briefs and by argument. It has been asserted here that the City of Springfield is not the relator in the case and is in no sense a party thereto. The information was originally filed by the Attorney General and verified by his oath. In the information the case was captioned "State of Missouri ex inf. Roy McKittrick, Attorney General, v. Springfield Water Company." In the answer and plea in abatement filed by respondent, however, the case was captioned "State of Missouri ex inf. Roy McKittrick, Attorney General, at the relation of the City of Springfield, Missouri, a municipal corporation, relator." At that time no objection to this styling of the case was made by the attorneys. Again, the reply followed the caption of the original information, but the rejoinder named the City of Springfield as relator. The original information was signed by the Attorney General and Assistant Attorney General and two special counsel, of whom one was the City Attorney of Springfield, and the other special counsel employed by the city. The Attorney General was not present in the courtroom during any of the hearings before the commissioner, and while his assistant was present during part of the hearing, he allowed the case to be pre-

sented almost entirely by the attorneys representing the city. It was shown in evidence that these attorneys were acting in pursuance of instructions from the City Council of Springfield. It was also shown that in a proceeding before the Public Service Commission the city had claimed that it was about to cause ouster proceedings to be instituted in this court by the Attorney General. We hold that the City of Springfield is the real party in interest in this action and the party at whose request the said information was filed, and the case will be so styled accordingly.

In the year 1882 the territory which is now included within Springfield was occupied by two separate municipalities: the City of Springfield and the City of North Springfield. The City of Springfield was operated under and by virtue of a special charter. [See Local Laws of 1885, pages 299 to 310, and Laws of 1874, page 398 et seq.] The City of North Springfield was then organized and operated as a city of the fourth class under general statute. In the year 1887 the two cities were united under the name of Springfield. In 1916 this city became and now is a city of the second class operating under the general statutes applicable to such cities.

Prior to the 10th day of October, 1882, one P. B. Perkins commenced negotiations for the construction of a water supply system. On that date the City of Springfield enacted Ordinance No. 349, known in the record as the "Perkins Ordinance." As some of the issues in this case will largely turn upon the construction of portions of this ordinance, we will set out the pertinent parts thereof in full.

Section 1. "That the City of Springfield, County of Green and State of Missouri, hereby gives and grants to and contracts with P. B. Perkins and assigns, as hereinafter provided and specified, for the term of twenty years or until purchased by said city from and after the date of the legal passage of this ordinance as hereinafter provided in Section 12 of this ordinance, in which event all of the rights and franchise granted by this ordinance shall cease and determine; the right and privilege of constructing, maintaining and operating Water Works for supplying water from the Little Sac and James Rivers or any other sufficient source of supply which is not polluted by the excreta and sewerage from the said City of Springfield. The said water to be made more desirable and wholesome by the process of filtration and settling in reservoirs for the supply of water to said City of Springfield for domestic, manufacturing, fire extinguishing, and the various uses for which water may be needed in said City of Springfield, provided the rate for said water shall not exceed an average charge of twenty-five cents per one thousand gallons to the various consumers.

"For the furtherance of the said purposes of water supply, the said Perkins and assigns hereby have the exclusive right and privilege to use all or any streets, lanes, alleys or public places necessary to

lay and maintain and service water pipes, erect hydrants and appurtenances necessary in which to supply water to the consumers. All excavations in streets shall be as speedily refilled and repaired and in as good condition as they were before such excavations were made or near as may be.''

Sections 2, 3 and 4 of said Ordinance are not here material. Section 5 provides that extension of mains shall be made when ordered by resolution of the City Council locating such extensions and giving the number of feet required; provided, that in such extensions there shall be at least one fire hydrant for every six hundred feet ordered laid down. Rentals for such additional fire hydrants were to be paid for in accordance with other terms of the ordinance. Where there was at least one resident customer paying a minimum of six dollars per annum for every seventy-five feet of pipe laid down, who should furnish security for the payment of rates, an extension must be made. Section 6 provided that in the original pipe distribution system there should be not less than sixty-five hydrants kept in repair by Perkins. Section 7 provided for the creation of additional hydrants as ordered by the City Council and provided for a rental to be paid to Perkins by the city of $50 per year to commence when such hydrant was ready to supply water. Section 8 provided for the rental of the original fire hydrant. Sections 9 and 10 authorize the issuance of bonds by Perkins and his assigns and the privilege of fire hydrant rents by them to secure such bonds. Section 11 is not here material.

Section 12 provided: ''The City shall have the right to purchase the said Water Works and appurtenances connected therewith at the expiration of ten years from the date of their completion, and at the expiration of each succeeding five years thereafter, at their fair and equitable value. Such value thereof as aforesaid shall be determined as follows:''

First, the parties might agree as to the value or, second, in case they did not agree, each party was to appoint an arbitrator and the two arbitrators were to select a third. If they could not agree upon a third man, one was to be appointed by the Circuit Court of Greene County. Section 14 provides for the acceptance of the ordinance by Perkins. Section 18 is as follows:

''This ordinance shall be in force and effect from and after its passage by the Council and approved by the Mayor and City Clerk and its ratification by the voters of said City of Springfield, Missouri, and its acceptance by said Perkins or his assigns as herein provided.''

Within ten days after the approval of this ordinance by the Mayor and Council, Perkins filed his written acceptance thereof ''when ratified by the voters of Springfield, Missouri, as per the provisions of said ordinance.'' On the same day on which this acceptance was filed the City Council adopted Ordinance No. 350. The preamble

of this ordinance states that the present resources of the Fire Department of the city were insufficient; that the general revenue of the city was insufficient to furnish effective appliances therefore; that effective fire protection could be had only by incurring an annual indebtedness and constituting and maintaining funds for the payment of such indebtedness, as it accrues, to be used only for fire protection purposes; that the State Constitution (Mo. Stat. Ann. Const., Art. 10, Sec. 11), forbids the city authorities to expend annually for corporate purposes a larger sum than that devised from a tax of fifty cents on the one hundred dollar valuation and also prohibits them from incurring an indebtedness in any one year exceeding the annual income provided for such year without first obtaining the consent of two-thirds of the qualified voters. The ordinance then provided for the submission to the voters of the City of Springfield a proposition:

"For incurring annual indebtedness for fire protection purposes and constituting and maintaining a fund for the payment of such indebtedness as it accrues by an additional tax not to exceed twenty-five cents on the one hundred dollar valuation."

An election was duly had and the proposition carried by a sufficient vote.

On February 9, 1883, the City of North Springfield had passed and approved an ordinance similar to the Perkins Ordinance above set forth, which was duly submitted to the voters and ratified by a sufficient vote. On completion of the water system a controversy arose between the City of Springfield and Perkins and the city refused to pay hydrant rentals. In April, 1883, Perkins filed suit in the Greene County Circuit Court for hydrant rentals then alleged to be due. In July, a committee, appointed to adjust these differences, reported to the Council a proposed Ordinance No. 458, which in August of that year was duly passed. The preamble of this ordinance states that it is desired to settle the controversy existing between the City and Perkins. Section 1 provides:

"The City shall have the right to purchase said Water Works and appurtenances connected therewith at the expiration of ten years from October 15, 1883, and at the expiration of each succeeding five years thereafter at the fair and equitable value as herein provided, and that at the expiration of ten years and each succeeding five years thereafter; that is to say, from October 15, 1883, if the City of Springfield shall in good faith contract for the purchase and delivery of said Water Works and the payment thereof at the value heretofore provided, and shall by proper resolution of the City Council of said City duly and legally passed, make known its intentions so to do by setting forth in such resolution its offer to purchase said Water Works and shall give notice to said P. B. Perkins or his assigns."

There was a provision as to the contents of said notice.

Section 2 provides for the acceptance of the works already con-

structed. This ordinance was duly accepted by the Springfield Water Company, assignee of Perkins, and the suit against the city was dismissed.

Before continuing to state the further relationship between the City of Springfield and Perkins and his assigns, it will be well to note the chain of title by which the present respondent took such rights as Perkins possessed. It will be remembered that the original Perkins Ordinance was adopted in 1882. In April of 1883 a group of three associates, of whom Perkins was one, was formed, and the rights of Perkins under the Ordinance, together with the physical properties of the water system, were assigned to them. In September, 1883, a corporation known as the Springfield Water Company was organized under the general corporation law of the State. The charter of said corporation stated the purposes of its organization as follows:

"To build, maintain and operate water works for supplying with water the street, lanes, alleys, squares and public places of the Cities of Springfield and North Springfield in Greene County, Missouri, and for supplying water for extinguishing fires and for domestic, manufacturing, irrigating and industrial uses of said cities and for irrigating in the territory adjacent thereto and to acquire and own or lease real estate and erect, construct and maintain all buildings, machinery and apparatus necessary in order to accomplish the purposes above mentioned."

The following month the three individuals who had taken over the Perkins rights assigned the same to the Springfield Water Company. In June, 1889, the said water company conveyed its property and assigned its rights to the Springfield Water Works Company, a newly organized corporation. In April, 1906, a third company called the Springfield Water Company (identical in name but not corporation existence with the first named company) took the property and rights of the second company by assignment. In February, 1911, this second Springfield Water Company assigned all its property and rights to the Springfield City Water Company, the present respondent.

If the Perkins Ordinance should be construed to limit the franchise granted thereby to 20 years, such franchise would have expired in 1902. The facts of the relationship of the city and the present water company and its predecessors in title subsequent to 1902, therefore become of vital importance. In February, 1903, after the expiration of the said 20-year period and during the tenure of the Springfield Water Works Company, the City Council of the City of Springfield adopted what is known as the "Mellette Ordinance No. 3212" which is in the form of a contract between the city and the Springfield Water Works Company. Section 1 of said ordinance, after naming the Springfield Water Works Company, speaks of it as "now already

having existence at said city and county aforesaid its water works, operating same under a franchise *heretofore* granted by said city, and hereinafter set out.'' By said ordinance the company is required to furnish an abundant supply of pure and wholesome water, make certain additions to its system, etc. It is also provided in said ordinance that the fire hydrant rent, which under the Perkins Ordinance had been set at $50, should be reduced to $40. Section 12 of said ordinance provided that the city reserves the right to purchase the water works property at the expiration of five years from the 15th day of October, 1903, and at the expiration of each successive five years thereafter, and contains provisions as to the fixing of the price for such purchase similar to those found in the Perkins Ordinance. In January, 1914, Ordinance No. 8212 was passed by the Council. This was an ordinance ''making temporary provisions with the Springfield City Water Company for supplying the City of Springfield with water for fire protection and sewer flushing purposes.'' It stated that the contract theretofore existing between the company and the city for furnishing water for fire protection and sewer flushing and other purposes covered by fire hydrant rentals had expired on the 15th day of October, 1913, but that the City had paid the full amount of hydrant rental to January 14th. It requested the company to continue furnishing service thereafter until the city and the company should have entered into a further written contract; it provided a forty dollar rental for each fire hydrant; it reserved the right to repeal the ordinance and stop payment of the fire hydrant on thirty days' written notice. During the period from 1902 to 1936 the city adopted a very large number of special ordinances requiring the respondent company and its predecessors to install new fire hydrants and make extensions, all of which requirements were complied with by the respondent and its predecessors. From time to time during the period respondent applied to the Public Service Commission of the State of Missouri for permission to issue securities of various kinds for the purpose of raising funds to improve and extend its plant and properties. In each instance the City of Springfield was duly notified by the Commission and in a number of instances appeared and joined the company in the request for permission to issue such securities. A number of letters were written to the Commission by various city officers in connection with these cases speaking in laudatory terms of the type of service and management of the respondent company.

This pleasant relationship seems to have continued until the great drouth of 1936. At that time there developed in the City of Springfield an epidemic of intestinal disorders. In an effort to determine the cause of this epidemic the city employed the engineering firm of Black and Veatch of Kansas City to make a survey of the water works situation and to make recommendations as to what should be

done. The engineers made a lengthy report containing certain recommendations as to the treatment of water, and further recommended that the capacity of the water plant be increased to 10,800,000 gallons per day. Shortly after, the City Clerk, at the direction of the Council, wrote to the respondent asking that it take such necessary steps as would comply with the findings of the experts. A few days later a Mr. West, vice-president and a director of the respondent company, came to Springfield and met with the Chamber of Commerce and city officials. Black and Veatch's report was read and Mr. West told the official that the company would proceed without delay to carry it out as completely as possible. Among other things, the company hastened the completion of a new well of the capacity of some 2,000,000 gallons, costing $75,000. About this time other new equipment costing $385,000 was almost ready. Other expensive improvements were contemplated and partially carried out during the next year.

In September, 1936, the Mayor of Springfield wrote the respondent demanding that they immediately sink additional deep wells so as to meet any future emergency and stating that the City expected to follow up this action by proceedings before the Public Service Commission "as they seem to have the sole police power of regulating the quality, quantity and supply of water throughout the State." Within less than two weeks, however, the City Council passed and the Mayor approved Special Ordinance No. 427, whereby it was ordained:

"That all rights and privileges granted to P. B. Perkins and assigns to use the streets, lanes, alleys and public places of the City of Springfield for a water distributing system under and by virtue of Ordinance No. 349, passed by the City of Springfield, Mo., and approved October 10, 1882, and under and by virtue of Ordinance No. 31 passed by the City of North Springfield, Mo., now Springfield, Mo., and approved February 8, 1883, be and the same are hereby declared terminated and ended, having heretofore expired by limitation and since termination having been tolerated by sufferance only."

The ordinance also directed the Mayor and City Attorney to promptly take all necessary legal steps for enforcing its provisions and contained an emergency clause.

In November, 1936, the respondent applied to the Public Service Commission for permission to make certain plant improvements, notice of the hearing having been served on the city. The city appeared specially and the Commission in deciding the case stated that:

"The City of Springfield intends to bring an ouster proceeding through the office of the Attorney General of the state to oust the applicant from its streets and alleys, which ouster proceeding if brought by the Attorney General and if carried to a successful end may require from two to four years."

18

I. Does respondent, as it contends, have a valid existing franchise or street easement under which it is using the public ways of Springfield for its mains and distribution system? It is unquestioned law that neither an individual nor a corporation has any natural or inherent right to use public streets except for ordinary traffic; that if a corporation possesses the right to make special uses of public streets for its equipment, that right must have been specially conferred upon it by the State in the form of a franchise. Although such franchise must in the final analysis come from the State, it may be granted by a municipality within the scope of its charter as the agent of the State. [State ex inf. McKittrick, Attorney General ex rel. California v. Utilities Co., 339 Mo. 385, 96 S. W. (2d) 607.] It therefore becomes pertinent to inquire: first, if the City of Springfield had charter authority to grant a perpetual franchise to Perkins and his assigns; and, second, assuming it did have such authority, whether it made a grant of that character.

Section 49 of the Charter of Springfield granted it power to provide the city with water and to provide for the extinguishment of fire. Section 55 granted to it all powers necessary to carry out express powers conferred upon it in other provisions. Under similar charter provisions this court held in City of Lexington v. Lafayette County Bank, 165 Mo. 671, 65 S. W. 948, that the power to provide the city with water for the extinguishment of fire carried with it as necessarily incident thereto the power to enter into a contract with a private utility for those purposes. Again, in State ex rel. Agents' Association v. Kansas City, 319 Mo. 386, 4 S. W. (2d) 427, we held that the establishment of a fire patrol service is auxiliary to a fire department and that the authority to maintain such a patrol included the authority to contract for its maintenance. Now, if the authority to make such a contract exists in general terms, it would be immaterial whether it were made with a corporation or an individual. Unless, therefore, there was some specific constitutional or statutory limitation upon the power of Springfield to make the original Perkins contract, the same was *intra vires*.

It is claimed by the relator that such statutory restriction existed at the time in Section 952, Revised Statutes 1879, in that said section specifically limited a franchise grant to twenty years and also required that the same be approved by the voters of the municipality. Sections 951 and 952, Revised Statutes 1879, were originally adopted in 1859 (see Laws of 1858-59, page 46 et seq.). They have been brought forward in the 1929 Revision with numerous amendments as Sections 4962 and 4963. Section 951 provided that a gas or water company should have power to manufacture and furnish gas and water in any municipality, district or neighborhood where located for public or private buildings or other purposes and should have power to lay conductors for conveying gas or water through

the streets of any municipality with the consent of the municipal authorities and under such reasonable regulations as such authorities might prescribe. Section 952 provided that the municipal authorities of any city, town or village were authorized to contract with such corporation for lighting by gas "or supplying with water the streets, lanes, alleys, squares and public places in any such city, town or village." It further provided that such municipal authorities might make such contract for any length of time not to exceed twenty years, and it contained a proviso that contracts entered into under the provisions of this act shall have no legal form until the same shall have been submitted to the vote of the qualified voters of the municipality.

A careful reading of the two sections discloses that they were intended to deal with two separate matters: first, the power of the municipality to grant its consent to the utility to use its streets for the purpose of laying mains, etc., as a necessary incident to its ordinary business of supplying service to private consumers—this matter is dealt with in Section 951; second, the right of the city to contract with the utility for lighting the public streets and for supplying water for the public streets, that is, for fire extinguishment, sewer flushing, etc. This latter subject is dealt with in Section 952 and it is this type of contract which under Section 952, was at this time subject to the twenty-year limitations and the requirement of popular approval. It will be seen that under the view thus taken of the two statutes, the mere granting of the street easement was not subject to any limitation as to time nor was it necessary to submit that proposition to the voters of the city. On this basis we hold that the City of Springfield had power to grant a franchise to use its streets for the location of water mains.

We proceed to the further question: Did the city grant such franchise by the Perkins Ordinance and those further ordinances adopted in connection therewith? The Perkins Ordinances themselves are not altogether clear. By the first section thereof, the city "Gives and grants to and contracts with P. B. Perkins and assigns, as hereinafter provided and specified for the term of twenty years or until purchased by the city" the right of constructing and operating water works in the city. It also provided that Perkins and assigns were to have:

"The exclusive right and privilege to use all streets, lanes, alleys and public places necessary in which to lay and maintain their service water pipes."

It will be recalled that the Perkin Ordinance also provided that the city might purchase the water works system at the end of ten years or at the end of any five-year period thereafter. Respondent contends that this means that Perkins and his assigns had the right to maintain their system until such system was bought by the

city and that such purchase could be made: first, at the end of ten years; or, second, or at the end of any five-year period thereafter in perpetuity.

Relator insists that the entire grant was for a period of twenty years with the privilege on the part of the city to buy respondent's property at the end of ten years, fifteen years, or twenty years, and that if the power to purchase were not exercised at the end of any one of these three periods and the full twenty years had elapsed, the franchise expired by limitation. Though, as we have said, the wording of the ordinance is somewhat lacking in clarity, we think the construction placed thereon by the respondent is the more reasonable one. Moreover, in construing an ambiguous contract we have a right to consider the practical construction placed thereon by the acts and conduct of the contracting parties, and such construction is of the greatest weight in determining its true meaning. [Clayton v. Wells, 324 Mo. 1176, 26 S. W. (2d) 969; Scotten v. Metropolitan Life Ins. Co., 336 Mo. 724, 81 S. W. (2d) 313; McFarland v. Gillioz, 327 Mo. 690, 37 S. W. (2d) 911; Schweizer v. Patton (Mo.), 116 S. W. (2d) 39; Lacy v. American Central Life Ins. Co. (Mo. App.), 115 S. W. (2d) 193; John Deere Plow Co. v. Cooper, 230 Mo. App. 167, 91 S. W. (2d) 145; Old Colony Trust Co. v. Omaha, 230 U. S. 100, 33 Sup. Ct. 976, 57 L. Ed. 93; Knox County v. Ninth National Bank, 147 U. S. 91, 13 Sup. Ct. 267, 37 L. Ed. 93.]

Again, after the expiration of twenty years, the City Council of Springfield adopted the Mellette Ordinance, which in its very terms expressly recognized that the franchise of respondent's predecessor in title was still in full force and effect. Furthermore, in the intervening period the city passed a large number of ordinances requiring extensions of service in the erection of fire hydrants, many of them referring to the terms of the Perkins Ordinance and all of them adopted in accordance with the provisions of that ordinance. Upon all of these matters respondent acted upon the assumption that the franchise was still in existence. Thus the parties have, by their own acts and conduct, expressly construed the Perkins Ordinance as granting a franchise in perpetuity terminable at the end of five-year periods by the exercise by the city of its option to purchase. Furthermore, in January, 1908, the City Council duly submitted to the voters of the City of Springfield a proposal to purchase the plant of the respondent's predecessor in title in the very manner provided under the original franchise. This proposal was rejected by the voters. On this basis we think that respondent has a *de jure* franchise in the City of Springfield at the present time. However, in the present situation, the provision contained in the first section of the Perkins Ordinance, supra, which purports to grant Perkins and assigns "the exclusive right and privilege" to lay and maintain their service water pipes in the streets and public places, was merely in-

cidental to the main purpose of the Ordinance, is separable from the remainder of the ordinance and consequently, if void, does not affect the validity of said remainder. [State ex inf. Chaney v. West Missouri Power Co. et al., 313 Mo. 283, l. c. 296, 281 S. W. 709, l. c. 712, 713; Carroll v. Campbell, 108 Mo. 550, l. c. 560-561, 17 S. W. 884.]

■ II. Furthermore, if the Perkins Ordinance were construed as not granting a *de jure* franchise extending beyond the twenty year period, it seems plain that the city is now estopped from claiming the termination thereof. That the doctrine of equitable estoppel applies under special circumstances to municipal corporations has been held by this court in numerous cases. [City of St. Joseph v. St. Joseph Terminal Railroad Co., 268 Mo. 47, 186 S. W. 1080; City of Mountain View v. Farmers' Telephone Co., 294 Mo. 623, 243 S. W. 153; State ex inf. Shartel ex rel. City of Sikeston v. Missouri Utilities Co., 331 Mo. 337, 53 S. W. (2d) 394.]

In State ex inf. McKittrick ex rel. City of Lebanon v. Missouri Standard Telephone Co., 337 Mo. 642, 85 S. W. (2d) 613, and in State ex inf. McKittrick ex rel. City of California v. Missouri Utilities Co., 339 Mo. 385, 96 S. W. (2d) 607, we recognized the propriety of applying the doctrine of estoppel in cases of the nature of the present case but held that under the facts existing in those cases no estoppel could be asserted. In the California case we analyzed at length the elements necessary to establish an equitable estoppel, holding them to be: First, a representation either express or implied through silence of the person estopped; second, a misreliance upon such representation on the part of the person asserting the estoppel; and, third, a change of position of the latter.

In the instant case there are numerous facts constituting representations on the part of the city to the respondent that its franchise was still in existence after 1902. There is the passage of the Mellette Ordinance expressly recognizing the existence of the franchise; there is the passage of the large number of extensions and fire hydrant ordinances also recognizing the same proposition; there is the abortive attempt to purchase the water works system under the terms of the Perkins Ordinance; and there is the fact that on many occasions when respondent sought authority from the Public Service Commission to issue securities for increasing its capital investment in Springfield, the city not only consented thereto but joined with the company in urging such action upon the Commission.

In State ex inf. McKittrick ex rel. City of California v. Missouri Utilities Co., respondent, supra, the record clearly showed that the respondent's franchise was expressly limited to twenty years and that that term had expired. The sole question was one of law as to whether such limitation was valid after the passage of the Public Service Commission Act. That matter had been decided by the Commission and the courts in numerous cases and we held that the

Utilities Company was bound to know this well-established rule of law. In the present instance, however, we are not dealing with a simple question of law but one of the interpretation of ordinances and contracts.

When one of the parties to a contract expressly places a certain interpretation upon it, not by his mere silence but by a long series of positive acts, the other party is certainly entitled to rely upon such interpretation. That the respondent in this case did rely upon the interpretation placed upon the franchise is obvious. The elements of representation and misreliance are therefore both present in this case. As to the change of position of the respondent brought about by such misreliance there can be no doubt. It has expended large sums of money for capital increases in Springfield. It has issued securities which have passed into the hands of innocent purchasers throughout the country, obviously based upon its belief that it had a perpetual franchise terminal only by the purchase of its plant at the fair and reasonable market value thereof.

We are of the opinion, that to grant a writ of ouster against the respondent would be against right and justice and we therefore hold that the city is now estopped to deny that respondent has a perpetual franchise. Ouster is therefore denied and the proceeding dismissed. All concur.